IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF VIRGINIA, | )<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 3:20-cv-177 |
| | ) |
| VIRGINIA ELECTRIC AND POWER COMPANY (d/b/a DOMINION ENERGY VIRGINIA) | )<br>)<br>)<br>) |
| Defendant. | )<br>) |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' UNOPPOSED MOTION TO ENTER CONSENT DECREE**

The United States and the Commonwealth of Virginia (collectively, "Plaintiffs") seek Court approval of the Consent Decree ("CD" or "Decree") with Virginia Electric and Power Company, d/b/a Dominion Energy Virginia ("Defendant"), lodged with this Court on March 13, 2020. *See* ECF No. 2. Under the proposed Decree, Defendant will implement measures designed to prevent future violations, including auditing and implementation of an environmental management system, a third party environmental audit, internal environmental audits, and training. In addition, Defendant must pay a $1.4 million civil penalty. The proposed Consent Decree resolves the Complaint, which was filed on the same day. *See* ECF No. 1. All parties support entry of the CD.

Thirty-day federal and state public comment periods have now passed. No comments were received during the federal comment period. The Commonwealth of Virginia (the "State") received one set of comments during its comment period from Prince William County, Virginia. The Prince William County comments do not question the adequacy of the injunctive relief to

1

resolve the violations at issue. After careful consideration of the Prince William County comments, the Plaintiffs continue to believe that the proposed Consent Decree is fair, adequate, and reasonable, and consistent with statutory purposes. The Plaintiffs hereby request that the Court approve and sign the Consent Decree lodged on March 13, 2020, and enter it as the final judgment in this action.

## I. BACKGROUND

### A. Complaint

The Complaint asserts claims on behalf of the United States and the State for civil penalties and injunctive relief against Defendant relating to steam electric power generation facilities operated by Defendant at multiple locations in Virginia and West Virginia. Compl. ECF No. 1 ¶ 1. The Complaint includes three categories of claims:

1. <u>NPDES Permit Violations</u>. Claims One through Four in the Complaint assert claims for violations of National Pollutant Discharge Elimination System ("NPDES") permits issued to Defendant under the Clean Water Act ("CWA") and the Virginia State Water Control Law ("SWCL"). *See* Compl. ¶¶ 47-94. The claims consist of violations of construction stormwater NPDES permits at sites in Virginia (Claim One), Compl. ¶¶ 47-56 & Ex. 1; violations of effluent limitations at power station facilities in Virginia and West Virginia (Claim Two), Compl. ¶¶ 57-67 & Ex. 2; violation of permit notification requirements at Defendant's Possum Point facility (Claim Three), Compl. ¶¶ 68-84 & Ex. 3; and violations of an NPDES permit condition that prohibits unauthorized discharges at facilities in Virginia (Claim Four), Compl. ¶¶ 85-94 & Ex. 4.

2. <u>State-Only Claims Under the SWCL</u>. Claim Five in the Complaint asserts a claim on behalf of the State for unpermitted discharges of pollutants from Defendant's Chesterfield

Power Station in violation of the SWCL. The claim is based on two seeps originating from Defendant's Chesterfield Power Station and daylighting along the James River shoreline. Compl. ¶¶ 95-103.

        3.      <u>Federal-Only Claims under EPCRA and CERCLA</u>. Claims Six and Seven in the Complaint assert claims on behalf of the United States under the Emergency Planning and Community Right-to-Know Act ("EPCRA") and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for failure to timely notify authorities after a release of hazardous substances at the Bellemeade Facility in Virginia and a second release of hazardous substances at the Mount Storm Facility in West Virginia. Compl. ¶¶ 104-123.

    **B.**    **Consent Decree**

The proposed Consent Decree requires Defendant to take multiple actions to prevent future violations:

- *EMS Audit and Implementation.* To address issues with environmental compliance mechanisms within the company, Defendant prepared a company-wide environmental management system ("EMS") during the negotiation of the proposed CD, which was reviewed by EPA and the Virginia Department of Environmental Quality and determined to be consistent with EPA's Compliance Focused Environmental Management System Enforcement Agreement Guidance. CD ¶¶ C-E & Appendix A. The EMS is an organizational system designed to manage compliance in a systematic, planned, and documented manner to standardize and formalize practices and programs used to maintain, track, and improve environmental performance. *See* CD ¶ 9(r). The CD requires Defendant to use a third party auditor to conduct an EMS audit and implement any recommendations for improvement identified by the auditor. CD ¶¶ 24-28.

- *Third-Party Environmental Audit*. Defendant is also required to conduct a third-party environmental audit of specified facilities in Virginia to evaluate compliance with the CWA and SWCL, as well as any applicable NPDES permits. Defendant must then take action to fully address any areas of concern or noncompliance. CD ¶¶ 29-33.

- *Internal Environmental Audits.* The CD requires Defendant to continue to implement its Internal Environmental Audit Program ("IEAP"), which includes regular internal audits and reporting at its operating facilities. An IEAP report must be provided to EPA and the

Virginia Department of Environmental Quality ("VADEQ") with the semi-annual reports required under the CD. CD ¶¶ F, 34-35.

- *Seep Identification and Mitigation.* To address the SWCL-only violations, the CD includes requirements for visual inspections and corrective measures to prevent future violations, as well as implementation of a seep mitigation plan to address the existing seeps. CD ¶¶ 36-37.

- *Training.* During negotiations, Defendant updated and implemented release reporting standard operating procedures ("SOPs"). CD ¶ G. The CD requires additional EPCRA and CERCLA release training on the release SOPs within 120 days of entry. CD ¶¶ 38-40. Defendant must also provide annual training on CWA compliance, the EMS, and CD obligations. CD ¶ 41.

In addition to injunctive relief, the CD requires Defendant to pay a total civil penalty of $1.4 million to resolve the claims in the Complaint: $410,000 to the United States and $990,000 to the State. CD ¶¶ 10-11. The penalty fully recovers economic benefit for the violations at issue. Decl. of Chad Harsh in Supp. of Mot. to Enter ("Harsh Decl."), Ex. 3 ¶ 13; Decl. of Justin Williams in Supp. of Mot. to Enter ("Williams Decl."), Ex. 3 ¶ 7. The Consent Decree resolves the claims alleged in the Complaint. CD ¶ 82.

### C.    Public Comment Period

Pursuant to 28 C.F.R. § 50.7 and Paragraph 99 of the Consent Decree, the United States held a public notice and comment period on the Decree, commenced by publishing notice of the Decree in the Federal Register on March 19, 2020. *See* 85 Fed. Reg. 15815-02. The federal comment period ended with no comments received.

The State also held a 30-day public notice and comment period, in accordance with 9 Va. Admin. Code § 25-31-910(B)(3), commenced by the running of notices in nine local papers and publication of the notice in the Virginia Register of Regulations. Prior to initiation of the 30-day public notice and comment period, the settlement in principal received the approval of the Director of the Department of Environmental Quality, the Attorney General of Virginia, and the Governor

in accordance with Va. Code § 2.2-514. The State received one set of comments during its comment period, from Prince William County, Virginia. The comment is attached as Exhibit 1 to the Motion to Enter.

## II. STANDARD OF REVIEW

The Fourth Circuit has explained that consent decrees have "elements of both judgment and contract" and are "subject to 'judicial approval and oversight' not present in other private settlements." *Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 152 (4th Cir. 2002) (quoting *Smyth v. Rivero*, 282 F.3d 268, 279-80 (4th Cir. 2002)). To approve a consent decree, a trial court must determine that it is "fair, adequate, and reasonable" and "not illegal, a product of collusion, or against the public interest." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (quoting *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991)).

A number of over-arching principles apply to the determination of whether a consent decree meets this standard. First, the court "should be guided by the general principle that settlements are encouraged." *North Carolina*, 180 F.3d at 581; *see also, United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). This principle is "especially *apropos*" in complex environmental suits brought by the government which, if litigated to completion, would "consume a significant amount of time and expense by the parties, including the public fisc, along with a substantial redirection of judicial resources." *United States v. Arch Coal, Inc.*, 829 F. Supp. 2d 408, 416 (S.D. W.Va. 2011).

Second, the presumption in favor of settlement is particularly strong where a consent decree has been negotiated "on behalf of a federal administrative agency… which enjoys substantial expertise in the environmental field." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991). Under these circumstances, "broad deference should be afforded

to [the agency's] expertise," *United States v. District of Columbia,* 933 F. Supp. 42, 47 (D.D.C. 1996), and the "district court must refrain from second-guessing the executive branch." *Cannons Eng'g*, 899 F.2d at 84.

Third, the consent decree must be reviewed in light of what it is – a settlement of claims and not a disposition after trial on the merits. *See, e.g., United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (a consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise"). Thus, a decree may take into account "reasonable discounts for litigation risks, time savings, and the like that may be justified." *United States v. Davis*, 261 F.3d 1, 26 (1st Cir. 2001).

Finally, "while the court may either approve or deny the issuance of a consent decree, generally it is not entitled to change the terms of the agreement stipulated to by the parties." *Colorado*, 937 F.2d at 509; *see also Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983) (a court is not "empowered to rewrite the settlement agreed upon by the parties," or to "delete, modify, or substitute certain provisions of the consent decree."). In reviewing the consent decree, the standard is not whether the decree is "one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *Cannons Eng'g*, 899 F.2d at 84.

### III. ARGUMENT

After reviewing the submission from Prince William County in detail, Plaintiffs remain convinced that the proposed Decree falls well within the governing standard for approval. *See North Carolina*, 180 F.3d at 581. The arms-length settlement process, the robust injunctive relief,

and the significant civil penalty together make clear that the proposed Consent Decree should be entered by this court.

### A. The Settlement Process Was Fair and Well Informed.

Fairness is generally understood to include two components, procedural fairness and substantive fairness. *See Cannons Eng'g*, 899 F.2d at 86-88. Procedural fairness is typically evaluated by looking at the negotiation process and "attempt[ing] to gauge its candor, openness and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86. Here, Plaintiffs and Defendant spent over two years negotiating the terms of the Consent Decree, with the exchange of multiple drafts, technical information, and communications along the way. Harsh Decl. ¶¶ 8-10. Negotiations were informed by input from agency scientists, as well as documents provided by the Defendant in certified responses to information requests issued by EPA under CWA Section 308. *Id.* All parties were represented by experienced counsel. *Id.* ¶ 10. There are no allegations of collusion between the parties, and the comments received do not raise any concerns about the procedural fairness of the process. There is no question that the Consent Decree is procedurally fair. *See North Carolina*, 180 F.3d at 581 (in considering fairness of a consent decree, the court should "consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement, and the experience of plaintiffs' counsel").

### B. The Consent Decree is Substantively Fair, Reasonable, and Adequate.

The proposed Consent Decree is substantively fair, reasonable, and adequate because it holds Defendant accountable for its violations, compels payment of a civil penalty above the economic benefit achieved from non-compliance, and requires measures that are tailored to ensure Defendant's ongoing compliance with the environmental laws involved. *See Cannons Eng'g*, 899 F.2d at 87 (substantive fairness involves "concepts of corrective justice and accountability"); *Akzo*

*Coatings*, 949 F.2d at 1437 (most important factor in determining reasonableness of decree is degree to which the remedy will adequately address the harm); *United States v. Lexington-Fayette Urban Cty Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (finding consent decree reasonable where it will bring defendant into compliance with Clean Water Act and prevent future violations). In particular, the injunctive relief requirements are designed to address the type of operation and maintenance failures that led to the violations at issue by requiring a series of processes and practices that will address potential environmental concerns and instill a corporate culture of compliance. Additional accountability will be provided through state and federal oversight of Defendant's compliance with the CD, as well as internal and external audits of compliance measures. These provisions are, based on the technical judgment of the Plaintiffs, adequate to address all the violations at issue. Harsh Decl. ¶¶ 15-20; Williams Decl. ¶ 8; *see Bragg v. Robertson*, 83 F. Supp. 2d 713, 717 (S.D. W.Va 2000) ("a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility"). The Prince William County comments do not suggest otherwise.

      **C.    The Consent Decree Serves the Public Interest.**

The proposed Decree is consistent with statutory purposes and serves the public interest. The injunctive relief is designed to prevent illegal discharges of pollutants from Defendant's facilities, a result which is wholly consistent with the CWA and the SWCL. *See* 33 U.S.C. § 1251(a) (the objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the nation's waters."); Va. Code Ann. § 62.1-44.2 (purposes of SWCL include to "safeguard the clean waters of the Commonwealth from pollution; [] prevent any increase in pollution; [and] reduce existing pollution"). The Consent Decree also mandates procedures and training that will ensure that federal, state, and local emergency responders will

receive appropriate notification of any releases of hazardous substances, consistent with the purposes of the CERCLA and EPCRA notification provisions. *See Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 705 (W.D. Ky. 2003) (purpose of CERCLA and EPCRA notice requirements is to provide agencies with information they need to assess hazards from releases). Moreover, entry of the Decree would ensure that the environmental benefits from these measures are immediately felt by the citizens of Virginia and West Virginia without the substantial expenditure of taxpayer and judicial resources that would be necessitated by litigation. *Bragg*, 83 F. Supp. 2d at 717 ("It is precisely the desire to avoid a protracted examination of the parties' legal rights that underlies entry of consent decrees. Both the parties and the general public benefit from the saving of time and money that results from the voluntary settlement of litigation."); *United States, et al. v. BP Prods. N. Am., Inc.*, No. 2:12-CV-207, 2012 WL 5411713, at *3-4 (N.D. Ind. Nov. 6, 2012) (consent decree "serves the public interest by providing these environmental benefits more quickly and at less cost than could be achieved through litigation… a risky proposition with uncertain results.").

      **D.**    **Response to Prince Williams County Comments**

The State received one set of comments on the Consent Decree, attached as Exhibit 1. The comments, submitted by Prince William County, fall into three categories: 1) civil penalty; 2) Environmental Management System; and 3) public access to information. Notably, Prince William County does not suggest that the injunctive relief in the Consent Decree will fail to remedy the violations alleged in the complaint. As discussed below, the comments do not otherwise provide a basis for denial of the Consent Decree negotiated by the parties.

      1.    <u>Civil Penalty</u>

Prince William County provides two comments relating to the civil penalty. First, the

County requests more information about how the penalty amount was determined, "including a calculation based upon the daily penalties imposed, to determine whether this amount is appropriate given the nature, severity, and occurrence of the alleged violations." Ex. 1 ¶ 1. As detailed in the attached declarations, EPA and VADEQ took a number of factors into account in determining the appropriate penalty for settlement, including economic benefit realized by the Defendant from the violations, gravity of harm (taking into account the nature, severity, and number of violations), history of noncompliance, good faith efforts to comply, and litigation risk. Harsh Decl. ¶¶ 11-14; Williams Decl. ¶¶ 4-8. Significantly, the civil penalty exceeds the Plaintiffs' calculated economic benefit for all of the violations in the complaint, and includes a substantial punitive component as deterrence for future violations. Harsh Decl. ¶ 13; Williams Decl. ¶ 7. The resulting civil penalty is consistent with the factors prescribed by the statutes involved, as well as the state and federal penalty policies created to ensure that penalties are consistently applied in the settlement context. Harsh Decl. ¶¶ 11-14; Williams Decl. ¶¶ 4-8.[1]

The second comment from Prince William County requests that the State, "through this settlement and Decree," provide $750,000 in funding toward certain specified water quality improvement projects that are currently underway or contemplated by the County. Ex. 1 ¶ 2. The comment does not provide any information connecting the violations alleged in the Complaint

---

[1] *See* 33 U.S.C. § 1319(d) (CWA penalty factors); 42 U.S.C. § 11045(b)(1)(C) (EPCRA penalty factors); Va. Code § 62.1-44.15(8e) (SWCL penalty factors); Interim Clean Water Act Settlement Penalty Policy (EPA March 1, 1995) (available at https://www.epa.gov/enforcement/interim-clean-water-act-settlement-penalty-policy); Enforcement Response Policy: EPCRA Sections 304, 311, 312, and CERCLA Section 103 (EPA Sept. 30, 1999), (available at https://www.epa.gov/enforcement/enforcement-response-policy-epcra-sections-304-311-312-and-cercla-section-103); Department of Environmental Quality – Civil Enforcement Manual, Chapter 4 (Effective Dec. 1, 2016), available at https://townhall.virginia.gov/L/gdocs.cfm?agencynumber=440.

with the impairments in Prince William County that form the basis for the specified water quality improvement projects.

The SWCL does not mandate that Dominion implement the projects requested by Prince William County as injunctive relief. Thus, Prince William County is effectively asking the State to reopen penalty negotiations to incorporate a supplemental environmental project ("SEP"): a project not otherwise required by law that a defendant agrees to undertake in return for partial mitigation of a civil penalty amount. *See* Va. Code § 10.1-1186.2; Department of Environmental Quality – Civil Enforcement Manual, Chapter 5 (effective May 2, 2012) at 5-7 ("SEP Guidance").[2]

The State's decision to resolve this case without a SEP does not provide a basis for denying entry of the Consent Decree. *See* SEP Guidance at 5-7 (VADEQ's "decision to agree or not agree to a SEP is "wholly discretionary and not subject to appeal."). SEPs are not injunctive relief, which a court can order a defendant to perform to ensure that the defendant comes into compliance with the applicable environmental law. They are instead voluntary projects to mitigate civil penalty that are negotiated during settlement of a civil enforcement action, after an underlying civil penalty amount has been established. Here, the proposed civil penalty was agreed upon following extensive negotiations. Prince William County's request would require the parties to renegotiate a settlement that took over two years to craft. Significant time and expense would need to be devoted to determining whether the proposed project fits within the parameters set by the state's SEP policy, make certain that the SEP is in the broader public interest, draft appropriate language, and negotiate with the Defendant regarding the details and mitigation value of the SEP. The result

---

[2] The SEP Guidance is available at
https://townhall.virginia.gov/L/gdocs.cfm?agencynumber=440.

would substantially delay implementation of the Consent Decree requirements and payment of civil penalty – assuming that an agreement on inclusion of the SEP can be reached at all. Denying entry would further delay resolution of a highly contested dispute between the parties, and would jeopardize the parties' ability to reach another acceptable proposed settlement of the claims in the complaint. The request for a SEP is not a reason to deny entry of the proposed Consent Decree. *Cf. Lexington-Fayette Urban County Gov't*, 591 F.3d at 485 (overturning district court decision rejecting consent decree because of the district court's concern that the civil penalty "could be better directed toward alleviating the conditions that violated the Clean Water Act. Such a concern by itself cannot support rejection of an otherwise proper settlement").

In addition to giving the State discretion to include SEPs in negotiated settlements, the SWCL also grants discretion to the court to direct penalty dollars toward pollution abatement projects in litigated matters. *See* Va. Code § 62.1-44.32.[3] The Plaintiffs submit that the Court should not revise the terms of the CD on the basis of this statutory provision in order to accommodate Prince William County's request. *See United States v. Colorado*, 937 F.2d at 509 (The court "should not take it upon himself to modify the terms of the proposed settlement decree', nor should he participate in any bargaining for better terms'") (*citing Plummer v. Chemical Bank*, 668 F.3d 654, 655 n.1 (2d Cir. 1982)). The SWCL provides that penalties shall be deposited into either the Virginia Environmental Emergency Response Fund (the "Emergency Response Fund") or the Virginia Stormwater Management Fund (the "Stormwater Fund"), depending on the nature of the violations. Va. Code § 62.1-44.32; Va. Code § 62.1-44.15:48. The Emergency Response

---

[3] This provision of the SWCL relates to the court's discretion in judicial matters and is not included in State guidance relating to assessment of civil penalties in the settlement context. *See generally,* Department of Environmental Quality – Civil Enforcement Manual, Chapters 4-5, available at https://townhall.virginia.gov/L/gdocs.cfm?agencynumber=440.

Fund is used by the State for emergency response to environmental pollution incidents, such as abandoned hazardous waste sites and overflows of septic lagoons. Va. Code § 10.1-2500; Williams Decl. ¶¶ 9-10. Monies in the Stormwater Fund are used to support the Department of Environmental Quality's responsibilities under the Virginia Stormwater Management Act such as permitting, plan review, and inspections. Va. Code § 62.1-44.15:29.

Here, Prince William County requests that over 75% of the amount under the CD intended for the Emergency Response and Stormwater Funds instead be directed to the County.[4] Yet the County is just one of multiple locations within the State of Virginia at which the violations alleged in the Complaint occurred. Further, Prince William County provides no information about the specific environmental harm caused by the Defendant's violations in its jurisdiction, nor does it connect the proposed projects to the pollution caused by those violations. Under these circumstances, the State's determination that the penalty amount should be paid in its entirety into the Emergency Response and Stormwater Funds for the benefit of all Virginia citizens is fair and reasonable.

2. EMS

Prince William County requests that the EMS include an "objective related to minimizing environmental impacts of operations to surrounding properties and community including the aspects of air, water, and noise pollution, as well as traffic levels." Ex. 1 ¶ 3. The County's request goes beyond the scope of the violations alleged in the Complaint, which do not address air pollution, noise pollution, or traffic levels. Nevertheless, the EMS required by the CD includes multiple elements consistent with Prince William County's request. For example, the overall

---

[4] Based on the specific violations resolved by the CD, 92.5% of the civil penalty will be directed to the Emergency Response Fund and 7.5% will be directed to the Stormwater Fund. Williams Decl. ¶¶ 9, 11.

objective of the EMS required by the CD is to ensure compliance with *all* environmental laws by standardizing and formalizing practices and programs used to maintain, track, and improve environmental performance. *See* CD ¶¶ 9(r), 27(a)(vi) (requiring an audit of the EMS to determine, among other things "[w]hether further improvements should be made to Defendant's written requirements or procedures to better achieve compliance with all environmental laws."). The policy upon which the EMS is based includes an express commitment to minimizing environmental risks:

> clearly communicate management commitment to achieving compliance with applicable federal, state, and local environmental statutes, regulations, enforceable agreements, and permits (hereinafter, "environmental requirements"), minimizing risks to the environment from unplanned or unauthorized releases of hazardous or harmful contaminants, and continual improvement in environmental performance.

CD Appendix A, ¶ 1.a. In order to meet this policy, the EMS must include "an ongoing process for assessing operations, for the purposes of ***preventing, controlling, or minimizing*** reasonably foreseeable releases, environmental process hazards, and risks of noncompliance with environmental requirements." *Id.* ¶ 5(a) (emphasis added). And, the EMS must include pollution prevention procedures "for preventing, reducing, recycling, reusing, and minimizing waste and emissions…" *Id.* ¶ 10.a. In sum, the EMS required under the CD is designed to meet the overall objective of "minimizing environmental impacts" proposed by Prince William County, and any changes to the CD based on this comment are unnecessary.

### 3. Public Access to Information

Finally, Prince William County makes two requests relating to public access to information: 1) that "all 3rd party EMS audits be made public through Dominion's and VDEQ's website," and 2) that the Consent Decree require an annual public meeting "to provide information to County residents on the Program progress and overall status and plans for construction and

mitigation projects, including, but not limited to, those related to coal ash storage and disposal." Ex. 1 ¶ 3.

As an initial matter, it is important to note that there are not any applicable statutory or regulatory provisions mandating the measures requested by Prince William County. That said, the Consent Decree expressly requires the Defendant to engage in community outreach: one of the twelve required elements of the EMS to be implemented by the Defendant is a "program for ongoing community education and involvement in the environmental aspects of the organization's operations and general environmental awareness." CD App. A ¶ 12.a. The Decree also requires reporting to EPA and the State about the status of Consent Decree implementation (CD ¶ 42(d)), the status of measures to address the Eastern Shoreline Seeps at the Chesterfield Power Station (CD ¶ 37), and the results of internal and external audits (CD ¶¶ 27(b)(ii), 32, 35). These reports will be accessible to the public through the Virginia Freedom of Information Act (and the federal Freedom of Information Act), to the extent they are not subject to a claim of confidential business information ("CBI"). *See* CD ¶ 80 (Defendant may assert that information provided under the CD is protected as CBI); 40 C.F.R. Part 2 (CBI regulations). In particular, VADEQ intends to follow Virginia's FOIA guidance, which promotes access to agency information and improves transparency and accountability for agency operations and decision.[5]

These measures represent a reasonable approach to obtaining compliance under the Consent Decree by ensuring that the regulators tasked with CD oversight have the necessary information, while at the same time providing reasonable public access to information. That the

---

[5] The Virginia FOIA guidance is available at
https://townhall.virginia.gov/L/GetFile.cfm?File=C:\TownHall\docroot\GuidanceDocs\440\GDoc_DEQ_5636_v2.pdf.

15

CD does not require posting of information to a website or contain an annual public meeting requirement does not alter the reasonableness of the Decree or otherwise provide a basis for denying its entry.

## IV.  CONCLUSION

The settlement embodied in the proposed Consent Decree constitutes the United States' and the State's best efforts to resolve this case in a manner consistent with the interests of the public. As discussed above, the Plaintiffs continue to believe that the proposed Consent Decree is fair, reasonable, consistent with statutory purposes, and in the public interest. The public comment received does not disclose facts or circumstances which indicate that the proposed judgment is inappropriate, improper, or inadequate. The Plaintiffs respectfully request the Court enter the proposed Decree.

Respectfully submitted,

ATTORNEYS FOR THE UNITED STATES

NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice

Date: July 13, 2020

*/s/ Laura A. Thoms*
Laura A. Thoms, DC Bar No. 488784
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P. O. Box 7611
Washington, D.C. 20044
Telephone: (202) 305-0260
Facsimile: (202) 616-6583
Email: laura.thoms@usdoj.gov

|  |  |
|---|---|
|  | G. ZACHARY TERWILLIGER<br>United States Attorney<br>Eastern District of Virginia |
| Date: July 13, 2020 | */s/ Robert P. McIntosh*<br>Robert P. McIntosh<br>Assistant United States Attorney<br>Virginia State Bar No. 66113<br>United States Attorney's Office<br>919 East Main Street, Suite 1900<br>Richmond, Virginia 23219<br>Telephone: (804) 819-7404<br>Fax:  (804) 771-2316<br>Email:  Robert.McIntosh@usdoj.gov |

FOR THE COMMONWEALTH OF VIRGINIA

|  |  |
|---|---|
| Date: July 9, 2020 | /s/ *David C. Grandis*<br>Mark R. Herring<br>Attorney General<br><br>Donald D. Anderson<br>Deputy Attorney General<br><br>Paul Kugelman, Jr.<br>Senior Assistant Attorney General<br>Environmental Section, Chief<br><br>David C. Grandis<br>Senior Assistant Attorney General<br>Office of the Attorney General<br>Virginia State Bar No. 47746<br>202 North 9th Street<br>Richmond, Virginia 23219<br>(804) 225-2741 (telephone)<br>(804) 786-2650 (fax)<br>Email: dgrandis@oag.state.va.us<br>*Counsel for the Commonwealth of Virginia* |

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2020, I caused the foregoing Memorandum in Support of the Plaintiffs' Unopposed Motion to Enter Consent Decree to be filed with the Clerk of Court using the CM/ECF system, and sent copies by electronic mail to the following:

Brooks M. Smith
Troutman Sanders LLP
1001 Haxall Point, 15th Floor
Richmond, VA 23219
brooks.smith@troutman.com
*Counsel for Defendant*

David C. Grandis
Senior Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 225-2741 Office
dgrandis@oag.state.va.us
*Counsel for the Commonwealth of Virginia*

/s/
Robert P. McIntosh
Assistant U.S. Attorney